**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| UNITED STATES, | CRIMINAL ACTION |
|---|---|
| v. | NO. 24-CR-22 |
| BRANDYN ALLEN SEABREEZE, | |

Baylson, J.                                                                                           June 4, 2024

## MEMORANDUM

Defendant Brandyn Seabreeze asks this Court to suppress evidence that will be used against him at trial. He argues that police officers impermissibly extended the length of his traffic stop, and separately unconstitutionally frisked him. Because officers' actions were lawful from the inception to conclusion of the traffic stop, Mr. Seabreeze's motion is **DENIED**.

## I.      PROCEDURAL HISTORY

On January 18, 2024, the Government indicted Brandyn Seabreeze, Defendant, for illegally possessing a firearm in violation of 18 U.S.C. 922(g)(1). ECF 1. Jury trial is set for June 10, 2024. ECF 15.

On April 22, 2024, Mr. Seabreeze filed a Motion to Suppress admission of the alleged firearm into evidence. Def. Mot. to Suppress, ECF 17. Mr. Seabreeze advanced two principal arguments. First and foremost, Mr. Seabreeze argues that the arresting officers impermissibly prolonged the traffic stop beyond its original basis without reasonable suspicion to do so. Id. at 6. Second, and alternatively, Mr. Seabreeze contends that the officers conducted a pat-down frisk of Mr. Seabreeze without reasonable suspicion that he was armed and dangerous. Id. at 16–17

1

On May 3, 2024, the Government responded to Mr. Seabreeze's motion. The Government opposed Mr. Seabreeze's motion, countering that the stop was not unlawfully prolonged and that the frisk of Mr. Seabreeze was constitutional. Gov. Resp., ECF 20.

On May 9, 2024, this Court held an evidentiary hearing in which the two primary police officers involved in the investigation and arrest testified. Both parties stipulated to several exhibits, including body worn camera footage recording the events and a Philadelphia Police Department Directive. Both parties also submitted post-hearing supplemental briefing, per this Court's request. Def. Supp. Resp., ECF 27; Gov. Supp. Resp, ECF 28.

## II.    **FACTUAL FINDINGS**

As of September 23, 2023, the night in question, Officer MacConnell had been a police officer with the Philadelphia Police Department for seventeen years. Supp. Hearing Tr., ECF 24, at 5:07–09 ("Tr."). At around 9:25 p.m., Officer MacConnell and his partner, Officer Fazio were on patrol in their unmarked police vehicle on the 5900 block of North Broad Street. Tr. 10:12–19, 11:02–05. Officer MacConnell saw a black Audi A8, later known to be driven by Mr. Seabreeze, traveling in the right lane of traffic moving northbound. Tr. 11:02–09. Officers MacConnell and Fazio were also travelling northbound in the left lane of traffic. Tr. 10:12–24.

Officer MacConnell, who was driving, pulled nearly parallel with Mr. Seabreeze's car and saw Mr. Seabreeze smoking what appeared to be a brown marijuana cigar out of an open window. Tr. 71:22–72:12, 11:10–21. Officer MacConnell testified at length describing the cigar, its wrapping compared to a "joint," and that it was "smoked down." Tr. 12:23–14:02. Officer MacConnell was also able to smell marijuana coming from Mr. Seabreeze's vehicle. Tr. 11:14–16, 72:06–07. As an officer of many years, including in a narcotics unit, Officer MacConnell recognized the smell and sight of marijuana. Tr. 6:08–11, 7:15–17, 11:23–12:01. Then, Officer

MacConnell saw Mr. Seabreeze swerve into the left lane of traffic, the lane he was driving in. Tr. 11:10–21. Officer MacConnell identified 5900 North Broad as a "high crime area" based on his experience in the vicinity investigating robberies, shootings, narcotics sales, and auto thefts and specifically making arrests for narcotics and firearms in the past year. Tr. 9:07–10:01. At that point, Officer MacConnell activated his emergency lights and initiated a traffic stop. Tr. 12:09–10. Mr. Seabreeze pulled over quickly at a gas station on the corner of North Broad and Godfrey. Tr. 12:14–17.

There was extensive testimony by Officer MacConnell and Officer Fazio about what happened after Mr. Seabreeze pulled into the gas station. Body camera footage from both Officer MacConnell and Fazio also captured the events. Def. Ex. D1 ("MacConnell BWC I"); Def. Ex. D2 ("Fazio BWC"); Def. Ex. D3 ("MacConnell BWC II"). Stated briefly, Officer MacConnell and Fazio testified that when they approached the car, they saw Mr. Seabreeze move his left shoulder forward and turn back towards the rear of the vehicle, which gave Officer MacConnell some suspicion that Mr. Seabreeze was attempting to conceal contraband or to prevent Officer MacConnell from observing something illicit in the car. Tr. 20:07–09, 25:20–25, 142:12–18. Officer MacConnell testified that Mr. Seabreeze's actions made him fear for his safety because he could not see his hands and may have been reaching for something that could harm the officers. Id. After he approached, Officer MacConnell shined his flashlight in the area where Mr. Seabreeze was turning—the backseat—and noticed a black backpack. Tr. 27:02–19.

In addition to noticing Mr. Seabreeze move toward the backseat on approach, Officer MacConnell saw visual cues that indicated Mr. Seabreeze was nervous. Mr. Seabreeze was breathing so heavily that Officer MacConnell could see his chest rise through his shirt. Tr. 35:05–11. Mr. Seabreeze also struggled to make or maintain eye contact while speaking. Id. Additionally,

Officer MacConnell could still smell marijuana coming from the vehicle. Tr. 35:14–20. Nonetheless, Officer MacConnell did not believe Mr. Seabreeze was impaired. Tr. 92:10–13. This initial interaction, wherein Officer MacConnell retrieved Mr. Seabreeze's driver's license, lasted less than 40 seconds. MacConnell BWC I 1:26:10–44.

Officers MacConnell and Fazio then returned to their patrol vehicle, called for backup, and ran the driver's license Mr. Seabreeze gave to Officer MacConnell. Tr. 35:23–36:11. After approximately one minute in the patrol car, Officer MacConnell verbalized that that he "fe[lt] like there was going to be something in that school bag" and speculated that the smell of marijuana was "probably" from what he observed Mr. Seabreeze smoking. MacConnell BWC II 1:27:45–53. After another minute and as backup arrived, Officer MacConnell and Fazio re-approached Mr. Seabreeze when he was attempting to get their attention. Tr. 105:11–19. At that time, Officer MacConnell acknowledged that the license had checked out, the insurance and registration on the vehicle was appropriate, and there was no suspicion of a stolen vehicle. Tr. 86:01–87:01.

When the officers re-approached, approximately two minutes after the first interaction with Mr. Seabreeze, Officer MacConnell asked Mr. Seabreeze if there was anything in the vehicle he needed to know about. Tr. 45:12–21, 110:18-25; MacConnell BWC II 1:29:30–45. Mr. Seabreeze first responded with his own questions—including why Officer MacConnell pulled him over—before denying having anything illegal in the vehicle. MacConnell BWC II 1:29:35–1:30:05. Officer MacConnell told Mr. Seabreeze that he saw him smoking marijuana while driving, which Mr. Seabreeze denied and re-asked about contraband in the car. MacConnell BWC II 1:29:59–1:30:12.

Despite his initial denial, Mr. Seabreeze then showed Officer MacConnell a small container that he said was, and Officer MacConnell recognized as, marijuana. MacConnell BWC II 1:30:20–

35; Tr. 48:11–16, 50:05–06, 116:07–25. Officer MacConnell continued to observe Mr. Seabreeze's nervous demeanor, specifically that he would avoid eye contact whenever asked if there was anything illegal in the vehicle, while meeting Officer MacConnell's eyes when answering other less incriminating questions. Tr. 50:09–51:19, 109:22–25.

Then, Officer MacConnell attempted to remove Mr. Seabreeze from the vehicle to conduct a safety frisk. MacConnell BWC II 1:30:36–1:33:36. Mr. Seabreeze did not immediately comply. Id. Rather, Mr. Seabreeze refused to get out of the vehicle for over three minutes, while Officer MacConnell explained to him why he wanted to have him step outside of the car and why he was worried about officer safety. Id.; Tr. 52:04–53:19. Officer MacConnell testified that Mr. Seabreeze's display of "defiance" was abnormal in his experience and led him to believe that Mr. Seabreeze was worried that there was something illegal in the vehicle. Tr. 52:01–15, 53:23–54:05, 119:03–07, 123:12–16. Eventually, Mr. Seabreeze complied with Officer MacConnell's command to exit the Audi. Tr. 127:05–13.

Officer MacConnell conducted a pat-down of Mr. Seabreeze's body. Officer MacConnell BWC II 1:33:45–1:34:42. He did not recover any contraband. Tr. 133:01–10. At that point, Officer MacConnell attempted to place Mr. Seabreeze in handcuffs while he conducted a frisk search of the vehicle. Tr. 42:24–43:04, 58:23–59:11. Mr. Seabreeze did not comply, but "tensed up," resisted, knocked Officer Fazio onto the ground, and attempted to flee. Tr. 44:01–19, 60:01–04. During the struggle and flight, Officer MacConnell responded by tasing Mr. Seabreeze, which subdued him and allowed officers to handcuff him. Tr. 60:08–17.

Officer MacConnell then searched the interior of the vehicle. Inside the black backpack, Officer MacConnell recovered a loaded black Glock 19 firearm. Tr. 61:01–06.

A. **Defendant's Credibility Contentions**

Mr. Seabreeze strongly challenges Officer MacConnell's credibility. In support, he emphasizes that Officer Fazio, who was sitting in the passenger seat of the patrol car, did not recall that Mr. Seabreeze was smoking what Officer MacConnell testified appeared to him to be a "marijuana cigar." Tr. 139:22–140:02, 143:10–15, 143:23–25. Rather, the thing that "sticks out in" her mind from the incident was that Mr. Seabreeze "swerved into the lane." Tr. 146:10–19. This discrepancy is accurate and has caused the Court to review the testimony of both officers very carefully.

On balance, this Court disagrees with Mr. Seabreeze's contentions in his briefs (Def. Reply, ECF 21; Def. Supp. Resp.) that Officer MacConnell was not credible and rejects that argument. Officer MacConnell testified very clearly and consistently, answered questions on very perceptive cross-examination, and did not waiver in his recollection about Mr. Seabreeze. Officer Fazio did not recall Mr. Seabreeze smoking anything resembling a "marijuana cigar," but did recall the odor of marijuana coming from Mr. Seabreeze's vehicle. Tr. 143:12–15. This provides some corroboration of Officer MacConnell's testimony.  Furthermore, Officer Fazio did corroborate Officer MacConnell's recollection about Mr. Seabreeze's movement toward the back seat. Tr. 142:12–18.

Some of the other actions that Mr. Seabreeze alleges undercut Officer MacConnell's credibility do not persuade this Court. Mr. Seabreeze contends that Officer MacConnell improperly turned off the audio on his body camera during the traffic stop, presumably to surreptitiously plan a false narrative about the marijuana cigar with Officer Fazio. However, such a nefarious purpose is not so easily drawn. Officer MacConnell testified that he turned the audio off to discuss tactics with Officer Fazio when they first returned to their cruiser to run Mr.

Seabreeze's driver's license, which, despite Mr. Seabreeze's mistaken impression, is directly in line with department policy. Tr. 37:01–10, 96:22-97:01, Def. Ex. D20, Directive 4.21-3 (C)(e) (officers are "PROHIBITED [from] RECORDING" discussion about "Operational strategies or tactics") (capitalization in original). And second, while it is true that nobody recovered a marijuana cigar during the stop, that fact alone, is not incendiary. Mr. Seabreeze could have disposed of the cigar before stopping, or the police could have simply not found it during the search. So, while the Defendant's outstanding brief makes a number of arguments against the credibility of Officer MacConnell, which the Court has reviewed and respects, ultimately, this Court disagrees.

Credibility of police officers is an important fact in motions to suppress, and the undersigned has had significant experience in analyzing testimony in such circumstances, but finds that the Government's arguments supporting Officer MacConnell's credibility are more persuasive than the Defendant's arguments attacking his credibility.

### III.   <u>DISCUSSION</u>

The Fourth Amendment protects individuals from "unreasonable searches and seizures." U.S. CONST. AMEND. IV. When law enforcement executes a seizure without a warrant grounded in probable cause, the government must prove, by a preponderance of the evidence, that "each individual act constituting a search or seizure under the Fourth Amendment was reasonable." <u>United States v. Ritter</u>, 416 F.3d 256, 261 (3d Cir. 2005). If officers obtained evidence because of a Fourth Amendment violation, moreover, that evidence must be suppressed. <u>United States v. Brown</u>, 448 F.3d 239, 244 (3d Cir. 2006).

<u>Terry</u> stops refer to a category of brief, investigatory stops undertaken by the government when an officer has a reasonable, articulable suspicion that criminal activity is afoot. <u>Terry v. Ohio</u>, 392 U.S. 1, 30 (1968); <u>United States v. Delfin-Colina</u>, 464 F.3d 392, 396 (3d Cir. 2006). While

the phraseology "reasonable suspicion" is nebulous, a few principles ground this analysis. First, reasonable articulable suspicion is not a particularly high bar; rather, it is a "minimal level of objective justification." Illinois v. Wardlow, 528 U.S. 119, 123 (2000). Second, courts "afford significant deference to a law enforcement officer's determination of reasonable suspicion" due to their "experience and specialized training to make inference from and deductions about the cumulative information available to them that might well elude an untrained person." United States v. Foster, 891 F.3d 93, 104 (3d Cir. 2018). And third, "consistent with the totality of the circumstances approach, reasonable suspicion cannot be defeated by a so-called 'divide-and-conquer' analysis, whereby each arguably suspicious factor is viewed in isolation and plausible, innocent explanations are offered for each." United States v. Green, 897 F.3d 173, 183 (3d Cir. 2018).

The arguments at bar channel the Fourth Amendment inquiry into two questions. First, did officers prolong the Terry stop after completing the initial purpose of traffic stop without having objectively reasonable articulable suspicion that other criminal activity was afoot? Second, did officers conduct a Terry frisk of Mr. Seabreeze and his vehicle without the requisite reasonable articulable suspicion that Mr. Seabreeze was armed and/or that his vehicle contained a weapon?

## A.  **Rodriguez Moment and Prolonged Stop**

Mr. Seabreeze appears to concede that the initial traffic infractions provided legitimate bases to stop him.[1] However, Mr. Seabreeze argues that the purpose of the traffic stop concluded

---

[1] As he should, for "[i]t is well-established that a traffic stop is lawful under the Fourth Amendment where a police officer observes a violation of the state traffic regulations." United States v. Moorefield, 111 F.3d 10, 12 (3d Cir. 1997). "[A]ny technical violation of the traffic code legitimized a stop, even if the stop is merely pretextual for an investigation of some other crime." United States v. Mosley, 454 F.3d 249, 252 (3d Cir. 2006). Here, Officer MacConnell saw Mr. Seabreeze smoking marijuana while driving his motor vehicle, smelled marijuana wafting from Mr. Seabreeze's car, and witnessed Mr. Seabreeze swerve out of his lane. Based on these observations, Officer MacConnell, had reasonable suspicion that Mr. Seabreeze was in possession of marijuana and driving while intoxicated under state law. See

after the officers' initial interaction with Mr. Seabreeze, and that the officers unconstitutionally prolonged the stop when they began inquiring into matters unrelated to the original mission. Rodriguez v. United States, 575 U.S. 348, 354–55 (2015).

The seminal case, Rodriguez, held that "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'— [1] to address the traffic violation that warranted the stop, . . . and [2] attend to related safety concerns." Id. at 354. Generally, "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance" are tasks that "ordinarily are tied to the mission of a traffic stop." United States v. Garner, 961 F.3d 264, 271 (3d Cir. 2020) (quoting Rodriguez, 575 U.S. at 355). Additionally, "some questions relating to a driver's travel plans ordinarily fall within the scope of the traffic stop, as do delays caused by safety concerns related to the stop." Id. When addressing whether brief questioning on matters outside the scope of the traffic stop violate the Fourth Amendment, the rule is clear: "[t]here is no de minimis exception." United States v. Clark, 902 F.3d 404, 410 (3d Cir. 2018) (recognizing that even 20 seconds of questioning unrelated to the original traffic stop is impermissible).

But while even minor extensions unsupported by reasonable articulable suspicion are unconstitutional, Rodriguez explains that "an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely." 575 U.S. at 356. That is because "[o]fficer safety during a traffic stop has been a longstanding and recognized concern." United States v. Hunter, 88 F. 4th 221, 225 (3d Cir. 2023). Indeed, "officer safety interest stems from the mission of the stop itself." Id. (quoting Rodriguez, 575 U.S. at 356). As such, "[t]asks tied to officer

---

Commonwealth v. Dabney, 274 A.3d 1283, 1291–92, appeal denied, 286 A.3d 1233 (Pa. Super. 2022) (holding that an individual violates 75 Pa.C.S.A. § 3802(d)(1)(i), Pennsylvania's driving under the influence law, when he operates a motor vehicle with "any amount" of marijuana in his blood).

safety are also part of the stop's mission when done out of an interest to protect officers." Clark, 902 F.3d at 410.

Some allowable per se safety precautions include ordering occupants to either remain or exit the vehicle during traffic stops. See Pennsylvania v. Mimms, 434 U.S. 106, 110–11; Maryland v. Wilson, 519 U.S. 408, 414–15 (1997); Moorefield, 111 F.3d at 13. But just because these actions are allowable abstractly does not mean officers may deploy them as pretext for investigating other crime. As the Third Circuit explained, "Rodriguez would seem to suggest that the validity [of a safety precaution] turns on [the officer's] motivation for making the request." Green, 897 F.3d at 182. That interpretation derives from the text of the decision, which holds "safety precautions taken in order to facilitate" investigation of other crimes are impermissible. Rodriguez, 575 U.S. at 356 (emphasis added).

In sum, when assessing when the Rodriguez moment occurred—the moment when the initial purpose of the traffic stop should have concluded—a Court must assess both (1) whether the officers were reasonably pursuing the primary purpose of the stop and (2) whether officers took any negligibly burdensome precautions in the interest of officer safety.

If the Court determines that the traffic stop extended past that Rodriguez moment, then "an officer must have an objectively reasonable and articulable suspicion that illegal activity had occurred or was occurring." Garner, 961 F.3d at 271. That analysis follows the well-worn standard, established in Terry v. Ohio. 392 U.S. 1, 27 (1968). Courts eschew bright-line rules in favor in favor of considering "the totality of the circumstances—the whole picture." United States v. Cortez, 449 U.S. 411, 417 (1981).

B. **Reasonable Suspicion that Individual is Armed**

To conduct a protective frisk of either an individual or a vehicle, an officer must reasonably suspect that he "is dealing with an armed and dangerous individual." Terry, 392 U.S. at 27; Michigan v. Long, 463 U.S. 1032, 1051 (1983). Under Long, an officer may search the passenger compartment of a vehicle where a weapon may be placed or hidden and accessible, provided he has reasonable suspicion that a weapon will be found. 463 U.S. at 1049–51. When conducting protective vehicle frisks where the defendant has not been arrested, "the possibility of access to weapons in the vehicle always exists, since the driver or passenger will be allowed to return to the vehicle when the interrogation is completed." Arizona v. Gant, 556 U.S. 332, 352 (2009) (Scalia, J., concurring). In contrast, when a defendant has been arrested, officers may only search a vehicle if they have probable cause to do so because the individual can no longer access his vehicle, mitigating safety concerns. Id.

Furtive movements can support reasonable suspicion that an individual is armed, justifying a frisk. Moorefield, 111 F.3d at 14. An officer "need not be absolutely certain" that movements are an attempt to "hide narcotics or a firearm" for "the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Id. (citing Terry, 392 U.S. at 27). Thus, credible testimony that a driver moved in a manner suggesting obfuscation or deception is a highly relevant fact in totality analysis. See United States v. King, 764 F. App'x 266, 269–70 (3d Cir. 2019) (non-precedential); see also United States v. Velazquez, 2024 WL 49690 at *6 (D.N.J. Jan. 4, 2024) (collecting cases discussing the significance of furtive movementS).

Additionally, presence of drugs also supports a frisk. As the Third Circuit succinctly put it, "[b]ecause drug dealers often carry guns," officers investigating drug crimes are reasonable to

suspect the individuals are "dangerous and might have weapons." <u>United States v. Davis</u>, 726 F.3d 434, 440 (3d Cir. 2013). Indeed, judges across the country "frequently recognize[ ] that guns and drugs go together in drug trafficking." <u>United States v. Douglas</u>, 72 F. 4th 332, 340 (D.C. Cir. 2023) (Rogers, J. concurring); <u>see also</u> <u>United States v. Arnott</u>, 758 F.3d 40, 45 (1st Cir. 2014) (observing that "[t]he connection between drugs and violence is, of course, legendary").

Finally, escalating police encounters, including refusal to follow officer orders, physical resistance, and flight, buttress findings of dangerousness, and even probable cause. Many in-Circuit district courts have held that flight and resisting police commands augment an officer's justifiable suspicion. <u>See, e.g.</u> <u>Velazquez</u>, 2024 WL 49690 at *7–8 (holding that officers developed <u>probable cause to arrest</u>, let alone reasonable suspicion, when the Defendant made furtive movements, "attempted flight from the officer during the investigatory stop" and obstructed "justice by trying to flee" from the officers and resist their arrest); <u>United States v. Laville</u>, 480 F.3d 187, 195 (3d Cir. 2007) (noting that "[i]t is well established that where police officers reasonably suspect that an individual may be engaged in criminal activity, and the individual deliberately takes flight when the officers attempt to stop and question him, the officers generally no longer have mere reasonable suspicion, but probable cause to arrest.") (internal quotations and citations omitted); <u>United States v. Bryant</u>, 2020 WL 6381386 at *11 (E.D. Pa. Oct. 30, 2020) (Kearney, J.) (summarizing Third Circuit jurisprudence that "refusing to obey orders and making suspicious hand motions may give rise to reasonable suspicion a suspect is armed and dangerous"); <u>see also United States v. White</u>, 648 F.2d 29, 46 n.54 (D.C. Cir. 1981) (recognizing that officers' suspicion understandably heightened when the Defendant "refused several requests to exit the car" and made furtive movements).

Moreover, some district courts have explicitly linked resistance of police commands and flight from lawful traffic stops as bases to search an individual's vehicle. In <u>United States v. Young</u>, officers searched the driver's vehicle because they saw him make a movement toward the center console of the car consistent with hiding contraband, before growing more suspicious after the Defendant was not compliant with officer commands, physically pushed the officers, and fled the scene. 2020 WL 605066 at *6 (W.D Mo. Jan. 22, 2020). The court, in denying the Defendant's motion to suppress, credited the officer's experience that "one of the reasons people flee on foot from traffic stops is because contraband is in the car." <u>Id.</u> Other courts have similarly clocked the commonsense notion that "the most likely explanation for [fleeing] behavior [is] that the car contain[s] contraband." <u>United States v. Harris</u>, 2005 WL 3021178 at *3 (D. Conn. Nov. 10, 2005); <u>see also</u> <u>United States v. Kitchen</u>, 686 F. Supp. 3d 768, 773 (S.D. Iowa) (finding that "Defendant's flight [from the traffic stop] provided independent grounds for officers to arrest him and search the vehicle.") (internal quotations and citations omitted); <u>accord</u> <u>United States v. Howard</u>, 311 F. Supp. 2d 637, 640 (S.D. Ohio 2003) ("Defendant's attempted flight after the discovery of the gun gave officers reasonable suspicion that Defendant had something more to hide"); <u>United States v. Clark</u>, 2021 WL 5630791 at *5–6 (D. Minn. Dec. 1, 2021) (finding that "headlong flight" was "certainly suggestive of wrongdoing" and factored into probable cause to search the Defendant's vehicle) (quoting <u>Wardlow</u>, 528 U.S. at 124).[2]

---

[2] On the other hand, the Fourth Circuit has squarely de-emphasized the importance of fleeing on a probable cause, versus reasonable articulable suspicion, analysis. In <u>United States v. Davis</u>, the panel reversed the district court and held that officers had not developed sufficient probable cause to search the Defendant's vehicle when the driver had fled, was subsequently arrested, and found with cash on his person. 997 F.3d 191, 201 (4th Cir. 2021). The court parsed its ruling carefully, delineating that while "flight coupled with the cash . . . may have given the officers an <u>articulable suspicion</u> that evidence of a crime could be located in the vehicle, it did not give them <u>probable cause</u>." <u>Id.</u> (emphasis in original). That distinction matters greatly, because as discussed <u>supra</u>, to sustain a post-arrest search of a vehicle, officers need probable cause, not mere suspicion. <u>Gant</u>, 556 U.S. at 352.

**C.  <u>The Relevance of Marijuana</u>**

The presence of marijuana during a traffic stop, either directly observed or inferred by detecting its odor, is a well-established basis to investigate illegal activity, and often search a vehicle outright.

For at least eighteen years, the odor or marijuana, "if articulable and particularized, may establish not merely reasonable suspicion, but probable cause" to search a vehicle. <u>United States v. Ramos</u>, 443 F.3d 304, 308 (3d Cir. 2006). Of course, the legal status of marijuana has changed dramatically since that time, including in Philadelphia, where possessing small amounts of marijuana merit only a civil infraction, and in Pennsylvania, where individuals can possess marijuana with a valid medical prescription. <u>Commonwealth v. Batista</u>, 219 A.3d 1199, 1202 (Pa. Super. 2019). Such reforms forced the Pennsylvania Supreme Court to update its own jurisprudence. Where, under the State Constitution, odor of marijuana formerly served as an automatic gateway to probable cause, it is now only "a factor, but not a stand-alone one, in evaluating the totality of the circumstances for purposes of determining whether police had probable cause" to search a vehicle. <u>Commonwealth v. Barr</u>, 266 A.3d 25, 41 (Pa. 2021).

Nonetheless, the Third Circuit has stated, albeit in non-precedential opinions, that state or local reclassifications of marijuana are irrelevant to its precedent. <u>United States v. Registe</u>, 830 F. App'x 708, 710 n.2 (3d Cir. 2020) (non-precedential) (holding that, because "marijuana and THC remain Schedule I controlled substances" under federal law, "[i]ts partial decriminalization in the Virgin Islands is therefore irrelevant in the determination of whether, under the totality of the circumstances, the smell of marijuana gives rise to probable cause to believe that the possession of marijuana in that instance is unlawful."); <u>United States v. Rodriguez-Mercado</u>, 788 F. App'x 97, 100 (3d Cir. 2019) (non-precedential) ("it is well settled that the smell of marijuana alone, if

articulable and particularized, may establish probable cause") (internal quotations and citations omitted).

Following the Third Circuit's cue, in-Circuit district courts continue to ascribe importance to the odor of marijuana emanating from a vehicle in probable cause analyses. See, e.g. United States v. Morris, 2023 WL 5607970, at *8 (W.D. Pa. Aug. 30, 2023) ("Corporal Zajac and Corporal Zazado each detected the smell of marijuana upon approaching the Corolla, and thus possessed probable cause, in addition to reasonable suspicion, to extend the traffic stop"); United States v. Felix, 2024 WL 1908914 at *4 (D. Del. May 1, 2024) (same); United States v. Wimbush, 2020 WL 1873020, at *16–17 (D.N.J. Apr. 15, 2020) (same).[3]

Circumstances that indicate an individual is intoxicated from marijuana, beyond presence via odor, carve out an independent basis of suspicion. Regardless of whether possessing marijuana is legal in a given locale, intoxication creates a safety risk for officers that can support reasonable suspicion to frisk. See King, 764 F. App'x at 269 n.5 (finding that intoxication is a "factor supporting reasonable suspicion to conduct a frisk"); United States v. Patton, 705 F.3d 734, 739 (7th Cir. 2013) (citing that intoxication presents a "reason to be concerned that [someone] might do something unpredictable, unwise, and dangerous"); see also Marvin v. City of Taylor, 509 F.3d 234, 246 (6th Cir. 2007) (recognizing risk that intoxicated people pose to officers during lawful stops). Of course, manifest intoxication is doubly concerning when affecting a driver on the roadway, who necessarily endangers other motorists, passengers, and pedestrians. This obvious

---

[3] Not every court of appeals is in accord with this approach. See, e.g., United States v. Martinez, 811 F. App'x 396, 397 (9th Cir. 2020) (non-precedential) (holding odor of marijuana is not alone sufficient for probable cause after state legalization). Indeed, some district courts located in states with legalized marijuana have held odor of marijuana is no longer evidence of criminality to support probable case. See United States v. Pavao, 2023 WL 3934555, at *4 (D.R.I. June 9, 2023), appeal filed.

proposition has not escaped jurists, who note that signs of consuming marijuana while driving are indicia of criminality, no matter the possession laws in the local jurisdiction. See Felix, 2024 WL 1908914 at *4 n.3 (explaining that notwithstanding Delaware's decriminalization statute, "consuming marijuana in a moving vehicle" remained a misdemeanor supporting probable cause to search the driver's vehicle); United States v. Hylton, 2017 WL 6521322 at *6 (D. Nev. Nov. 15, 2017) (holding that officer's probable cause to believe driver was driving under the influence of marijuana sustained search of vehicle for contraband).

## IV.   APPLICATION

Applying the law here, the scope of this suppression requires addressing three issues. First, did the officers ever extend the initial purpose of the stop, and if so, did they have reasonable articulable suspicion to do so? Second, did the officers have reasonable suspicion that Mr. Seabreeze's was armed and dangerous to initiate a Terry frisk? And third, although not the focus of either party, this Court must address whether officers had probable cause to search Mr. Seabreeze's vehicle after he was arrested?

### A. Officers Did Not Unlawfully Prolong the Stop

Credible officer testimony answers the first question. Observing an individual smoking marijuana while driving is a serious offense, which provides ample latitude to investigate the presence of illegal substances, allows officers to take safety precautions due to possible driver intoxication, and authorizes a sobriety investigation. Importantly, it is irrelevant that possession of small amounts of marijuana is only a civil offense in Philadelphia. The crime committed was not merely possessing, but imbibing the substance while operating a motor vehicle, which is far more serious and a clear violation of Pennsylvania law. See Dabney, 274 A.3d at 1290.

Thus, this Court rejects Mr. Seabreeze's argument that officers prolonged the stop beyond the parameters of its initial purpose. In other words, there was never a <u>Rodriguez</u> moment for Mr. Seabreeze to contest. In conducting this initial stop, Officer MacConnell spoke with Mr. Seabreeze for less than 40 seconds to retrieve the license, returned to his vehicle and stated he smelled marijuana, called backup for safety concerns, and then re-approached Mr. Seabreeze when backup arrived two minutes later to investigate the presence of contraband. <u>Supra</u> at 3.   While Mr. Seabreeze emphasizes that the officers told him they were not interested in his marijuana offenses, the question is whether there were <u>objectively</u> reasonable facts to investigate the stop, not the officers' subjective purpose. <u>See</u> <u>Brigham City, Utah v. Stuart</u>, 547 U.S. 398, 404 (2006) (re-affirming that an "officer's subjective motivation is irrelevant," but that "regardless of the individual officer's state of mind, as long as the circumstances, viewed <u>objectively</u>, justify the action," it is reasonable under the Fourth Amendment) (internal quotations and citations omitted) (emphasis in original). Witnessing Mr. Seabreeze smoking marijuana while driving, and smelling marijuana, in conjunction with his nervousness, presence in a high-crime area, and furtive movement to the backseat upon their initial approach, gave officers sufficient articulable facts to call for backup as a safety precaution, and ask about other contraband that could be in the vehicle without impermissibly prolonging the stop. <u>See</u> <u>Garner</u>, 961 F.3d at 270 (explaining that calling for backup to ensure safety during traffic stops investigations is routinely permissible). [4]

---

[4] Even if this Court did not credit that Officer MacConnell saw Mr. Seabreeze smoking marijuana while driving, which it does, both officers corroborated that the odor of marijuana emanated from the driver side window, which Officer MacConnell approached at the onset of the stop. Tr. 35:14–20; Tr. 143:12–15. Officer MacConnell testified to being present in a high-crime area, observing one furtive movement toward the backseat of the vehicle, believing Mr. Seabreeze was nervous, and smelling marijuana. <u>Supra</u> at 3. Given these facts, it was reasonable for Officer MacConnell to investigate the presence of contraband. Weighing most heavily is that the Third Circuit continues to adhere to the significance of odor of marijuana in the traffic stop context to justify searches, let alone limited continued investigation. <u>See</u> <u>Rodriguez-Mercado</u>, 788 F. App'x at 100.

Further, no actions after the re-approachment impermissibly prolonged the stop.[5] At that time, Officer MacConnell diligently inquired about contraband in the vehicle and directly viewed a container with marijuana, before asking Mr. Seabreeze to step out of the vehicle, which is per se permissible. Mimms, 434 U.S. at 111 n.6 (holding that officers may order a driver out of a vehicle during a lawful traffic stop). Indeed, approximately thirty seconds passed between when Officer MacConnell re-approached and when he asked about contraband in the vehicle. MacConnell BWC II 1:29:00–1:29:35. Moreover, Mr. Seabreeze's evasive behavior in response to Officer MacConnell's questions and defiance to his order to exit the vehicle only sharpened, rather than dissipated suspicion. See United States v. Nelson, 284 F.3d 472, 477 (3d Cir. 2002) ("evasive behavior is a pertinent factor in determining reasonable suspicion.") (internal quotations and citations omitted); United States v. Thompson, 772 F.3d 752, 759 (3d Cir. 2014) (holding that Defendant's visible nervousness and halting responses to incriminating questions contributed to reasonable suspicion finding); Bryant, 2020 WL 6381386, at *11 ("Our Court of Appeals has held, on a few occasions, refusing to obey orders and making suspicious hand motions may give rise to reasonable suspicion a suspect is armed and dangerous.").

**B. Officers Harbored Reasonable Suspicion that Mr. Seabreeze was Armed**

Onto the second question, the officers harbored sufficient facts to suspect Mr. Seabreeze had a weapon. As discussed, many other district courts have found that scenarios with facts like the one at bar are sufficient to authorize a frisk. Those facts include: (1) Mr. Seabreeze's furtive movement to the back of the vehicle when first pulled over; (2) his observed nervousness, heavy breathing, and lack of eye contact;  (3) his changed demeanor when questioned about whether the

---

[5] Mr. Seabreeze attacks the decision to continue to detain Mr. Seabreeze after the first conversation as the impermissible Rodriguez moment, regardless of the content of the second conversation. Out of an abundance of caution, this Court will address why, even though not explicitly challenged, officers' investigation was proper during the second conversation.

vehicle contained contraband; (4) his evasive and obstructive behavior when ordered out of the vehicle;[6] (5) the presence of drugs in the car, which commonly accompanies a firearm; and (6), Officer MacConnell's observation that he saw Mr. Seabreeze smoking marijuana suggesting intoxication.[7]

### C. <u>Officers Lawfully Searched Mr. Seabreeze's Vehicle</u>

The government initially argued that officers searched Mr. Seabreeze's vehicle pursuant to a weapon "frisk." <u>Long</u>, 463 U.S. at 1051. However, once it is clear an individual has been arrested and will not return to the vehicle, the justifications for a protective frisk dissipate. <u>Gant</u>, 556 U.S. at 352. Because Officer MacConnell testified that he would not return Mr. Seabreeze to the vehicle after his flight and resistance, the government's search is only justifiable if officers had probable cause that they would find contraband. Tr. 64:04–65:25.

The automobile exception permits vehicle searches without a warrant if there is "probable cause to believe that the vehicle contains evidence of a crime." <u>United States v. Donahue</u>, 764 F.3d 293, 299–300 (3d Cir. 2014).

At the time of the vehicle search, officers had developed probable cause. For one, it was "immediately apparent" that contraband—the marijuana Mr. Seabreeze showed Officer MacConnell—was inside the vehicle, which justified its seizure and officers to search the Audi for further evidence. <u>United States v. Goerig</u>, -- F.4th -- 2024 WL 2281664, at *3 (3d Cir. May 21,

---

[6] While Officer MacConnell had decided to frisk Mr. Seabreeze before he exited the vehicle, his subjective motivations are irrelevant. Because Mr. Seabreeze's resistance to the lawful <u>Mimms</u> order preceded the frisk, regardless of Officer MacConnell's future intent, his intransigence is properly considered in the objective <u>Terry</u> evaluation of whether Mr. Seabreeze was armed.

[7] Critically, this Court undertakes the reasonable suspicion analysis before Mr. Seabreeze physically resisted officers and fled the scene. As shown on the body camera, Mr. Seabreeze displayed verbal skepticism, but did not physically resist officers or flee the stop until after officers patted him down and tried to handcuff him. MacConnell BWC II 1:30:36–1:33:36. Thus, those post-frisk actions do not affect the reasonableness of the frisk.

2024); United States v. Roberson, 2022 WL 4529156, at *6 (N.D. Ind. Sept. 28, 2022) ("once the officers viewed the marijuana or marijuana-like substances in plain view, probable cause to continue the search of the vehicle came easily"). Moreover, logic demands that if the odor of marijuana is itself sufficient to justify an automobile search, then eye-witness evidence of marijuana more than meets the probable cause threshold. Ramos, 443 F.3d at 308.

But there is more, Mr. Seabreeze's physical resistance and flight also contributed to the officers' probable cause. As discussed in the case law above, physical resistance and flight from a traffic stop are signs that an individual is trying to distance himself from or secret away contraband. See, e.g., Laville, 480 F.3d at 195. Here, Mr. Seabreeze seemed apprehensive of exiting his car until officers told him they were only going to frisk him and then return him to his vehicle. MacConnell BWC II 1:30:36–1:34:10. Then, only when officers attempted to handcuff him to conduct a search of the car, did he escalate to physical resistance and flight. MacConnell BWC II 1:34:15–1:35:45. Given this chronology, a reasonable officer would conclude as Officer MacConnell did—that Mr. Seabreeze first wanted assurance that contraband in the vehicle would remain undetected, before fleeing when he realized officers intended to search the vehicle. Tr. 52:11–15. Altogether, the search was constitutional because the presence and odor of marijuana, and Mr. Seabreeze's resistance and flight ripened officer suspicion into probable cause.

### V.   CONCLUSION

For the foregoing reasons, Mr. Seabreeze's motion to suppress is **DENIED**.

O:\David.2023\24-cr-22 USA v. Seabreeze\Seabreeze Suppression Final Draft.docx